**THIRD DIVISION**
**DOYLE, P. J.,**
**GOBEIL, J., and SENIOR JUDGE FULLER**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**November 1, 2023**

# In the Court of Appeals of Georgia

A23A0662. FELTS et al. v. THAXTON.

DOYLE, Presiding Judge.

Alice Felts filed the instant lawsuit against Pamela Thaxton in order to set aside David Silvian's designation of Thaxton as the beneficiary of an annuity, claiming that Thaxton used undue influence to become the beneficiary. During trial, Thaxton moved for a directed verdict, which the trial court granted, finding that Felts had failed to present sufficient evidence of undue influence. For the reasons that follow, we affirm in part and reverse in part.

We review de novo the grant of a motion for a directed verdict, construing the evidence in favor of Felts as the nonmovant.[1] Viewing the record in this light, Felts

---

[1] See *Rivers v. South Auction & Realty*, 351 Ga. App. 179, 183 (2) (830 SE2d 636) (2019).

and Silvian met in 1996, and in 1999, Silvian made Felts his durable power of attorney. The two were married in 2000, and he named her his executor, beneficiary, and healthcare power of attorney. The two eventually divorced in 2005, and Felts moved out of state, but the two remained close. Despite their divorce, in 2006, Silvian prepared a new will naming Felts as his primary beneficiary and executor and naming Felts's granddaughter as his secondary beneficiary, and he again named Felts as his healthcare power of attorney, outlining his wishes for end-of-life care and burial should he predecease her. Between 2006 and approximately a month prior to Silvian's death in April 2018, the two spoke on the phone usually at least once a day.

Around 2014, Silvian had a heart valve replacement and thereafter suffered depression and anxiety. Silvian often relied on Felts to intercede with doctors on his behalf. In 2016, Silvian sent an email to Felts relaying how unhappy and lonely he was at that time. That said, Silvian had several people who frequently helped him with errands, grocery shopping, and house cleaning, all of whom he spoke about to Felts, but she did not know of him leaving them any money in his will or giving them money at the time aside from reimbursements.

Silvian's health deteriorated, and in early 2017, Silvian, fell at his home, and neighbors assisted in getting him to a hospital. Felts spoke to adult protective services

as well as a hospital social worker to attempt to get Silvian into an assisted living facility, but several would not take him. Felts spoke to Silvian several times a day while he was in the hospital after the fall, and she testified about troubling statements he made to her that indicated he was not recalling events correctly.

On February 26, 2017, Silvian moved into Arbor Terrace, an assisted living home.[2] That same day, Silvian met Thaxton for the first time at his home; at the request of Arbor Terrace's Executive Director, she assisted him with moving items from his home to Arbor Terrace.[3] Fewer than three weeks thereafter, the beneficiary designation on his large annuity fund[4] was changed from Felts to Thaxton, who was characterized on the document as his "caregiver and friend."[5] Thaxton testified that

---

[2] Felts testified that she suffered a mini-stroke the same day, which caused her to have a car accident. She had not driven by the time of trial, which she testified is why she had not visited him or assisted with his moves.

[3] Thaxton worked for Arbor Terrace as an independent contractor for three (3) days beginning on March 1, 2017.

[4] The evidence showed that on March 8, 2017, someone made an inquiry with the brokerage firm about the lump sum of the annuity if it were paid out on that date, but Thaxton denied that she contacted the firm. As of May 2015, the lump sum amount would have been approximately $288,000 according to Silvian's business records.

[5] The video depositions of Sam Silberman and Dr. James Michael Cobb were introduced at trial. Transcripts of those depositions were reviewed on appeal rather

she assisted with moving Silvian's personal items, hung pictures for him, and fixed his phone, among other such tasks during those three weeks, for which services Silvian paid her $20 an hour; she also visited him with her dogs and played cards with him, although the time line of when these visits began is unclear. Thaxton also testified that she assisted Silvian in completing the change of beneficiary form, completing all parts of the document except for his signature.

In September 2017, about six months after Silvian allegedly changed his annuity beneficiary to Thaxton, Silvian took a picture of his apartment at Arbor Terrace showing his furniture and personal belongings and attached it to an email entitled "My estate," which he addressed to Felts, a number of other friends, and distant family, but not to Thaxton. Around that same time, Felts asked him about Thaxton, and Silvian told her that he and Thaxton were "on the outs" because he would not use her attorney for a matter; Silvian did not mention Thaxton again until 2018, close to his death.

Felts and Sam Silberman (another long-time friend of Silvian) testified that Silvian described Thaxton to them as his "bookkeeper" and that she assisted with

_____

than the videos themselves, which were not transmitted with the appellate record.

some checking transactions, in one instance writing a $500 check to Silvian's accountant as well as, at Silvian's request, "holding" a $20,000 check and deposit slip for his brokerage. Silberman testified that he noticed a marked decline in Silvian's capacity between 2016-2018, and Silvian told him that he relied heavily on Thaxton for his finances after moving to Arbor Terrace, which was unlike Silvian, who Silberman characterized as being meticulous about managing his own finances. Moreover, there was testimony that shortly after moving to Arbor Terrace, Silvian entered into a rent-to-own lease of his home with an Arbor Terrace employee for a rental amount and ownership valuation that was substantially under market for the property.

After Silvian's death, Felts began working on his estate and discovered the change in the annuity beneficiary. She then filed the instant lawsuit, claiming that Thaxton had unduly influenced Silvian to name her as his beneficiary on the annuity. In the midst of trial, Thaxton moved for a direct verdict, which motion the trial court granted. In its order, the trial court concluded,

> [t]here was no evidence presented by Felts to prove that Thaxton engaged in any type of inappropriate action in an attempt to unduly influence Silvian to change the primary beneficiary designation on the Nationwide annuity from Felts to Thaxton. There was no evidence

5

presented that Felts and Silvian enjoyed a confidential relationship as contemplated by Georgia [l]aw. There was no evidence presented that on the evening of March 16, 2017, Silvian was incompetent or incapacitated when he executed the beneficiary designation change form. There is just simply no conflict in the evidence with respect to any material issue that would authorize a jury to find for Felts on this claim.

. 1. In several enumerations of error, Thaxton appeals, arguing that the trial court erred by granting a directed verdict.

A directed verdict is authorized only when there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict. . . . A will[6] is invalid if anything destroys the testator's freedom of volition, such as undue influence whereby the will of another is substituted for the wishes of the testator. Undue influence may take many forms and may operate through diverse channels. There is no requirement that the undue influence be directly attributable to the propounder or to a single beneficiary. Although evidence which merely shows an opportunity to influence is not itself sufficient, a caveat based upon the ground of undue influence may be supported by a wide range of evidence, as such influence can seldom be shown except by

---

[6] Because the annuity at issue here is analogous to a trust or a bequest in a will, and because the concept of undue influence typically arises in cases involving such instruments, we rely primarily on decisions addressing wills and trusts in this opinion.

circumstantial evidence. In particular, the question of whether a will is the product of undue influence is generally for the factfinder.[7]

Further, "a rebuttable presumption of undue influence arises when a beneficiary under a will occupies a confidential relationship with the testator, is not the natural object of his bounty, and takes an active part in the planning, preparation, or execution of the will."[8]

In this case, the evidence established a question for the jury on the issue of undue influence, including the initial question of whether Thaxton occupied a confidential relationship with Silvian, which would have created a rebuttable presumption of undue influence, as well as whether Silvian's mental capacity was in a diminished state such that any undue influence was easier to accomplish.

---

[7] (Citations and punctuation omitted.) *Odom v. Hughes*, 293 Ga. 447, 453-454 (3) (748 SE2d 839) (2013), quoting *Bean v. Wilson*, 283 Ga. 511, 512 (1) (661 SE2d 518) (2008); *Bailey v. Edmundson*, 280 Ga. 528, 530 (1) (630 SE2d 396) (2006); *Dyer v. Souther*, 272 Ga. 263, 265 (2) (528 SE2d 242) (2000).

[8] (Punctuation omitted.) *Bean*, 283 Ga. at 512 (1), quoting *Bailey*, 280 Ga. at 529 (1). In 2018, when Felts filed the action at issue, OCGA § 23-2-58 (2018) read: "[a]ny relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc."

The Georgia Supreme Court's decision in *Bean v. Wilson*[9] is instructive here. In *Bean*, relatives of the decedent had hired a live-in nurse who cared for the decedent for over five years. Four months after the nurse moved into the decedent's home, the defendant relatives and nurse took the decedent to his attorney to change his will to reflect them as the beneficiaries of his will rather than the decedent's adult child.[10] The trial court found that the plaintiff had presented sufficient circumstantial evidence of undue influence in order to create a fact question for the jury, which ultimately found against the defendants, who appealed the verdict to the Supreme Court of Georgia.[11] The defendants argued that the evidence of undue influence was merely speculative and that the trial court should have granted a directed verdict on the claim.[12] The Supreme Court affirmed the judgment, explaining that by virtue of the nurse assisting the decedent with daily living tasks and also being involved with the decedent's change of his will, the plaintiff had presented sufficient evidence that the nurse had a confidential relationship with the decedent, explaining that such a

[9] 283 Ga. at 511.

[10] See id. at 512 (1).

[11] See id. at 512-513 (1).

[12] See id. at 512 (1).

8

rebuttable presumption exists when "a party is so situated as to exercise a controlling influence over the will, conduct, and interest of another."[13]

Here, Thaxton testified that during the three weeks prior to Silvian's beneficiary change, she helped him get settled into the facility, including preparing his living space, writing checks for him, and completely preparing the beneficiary change form aside from his signature. The beneficiary change was completed without the involvement of an attorney, as was the case in *Bean*, making the possibility of Thaxton's control over Silvian's conduct more likely.[14] This was sufficient evidence to create a jury question as to whether Thaxton and Silvian had a confidential relationship, which along with a question of fact as to whether Thaxton was "the natural object of his bounty" and her admission that she actively assisted in the beneficiary change, could trigger a rebuttable presumption of undue influence.[15] While the trial court characterized this evidence as speculative, it is instead

---

[13] See id. at 513 (1). See also *Odom*, 293 Ga. at 454-455 (3); *In re Estate of Henry*, 366 Ga. App. 638, 641-642 (1) (883 SE2d 855) (2023).

[14] See *Bean*, 283 Ga. at 513 (1).

[15] See id. (quoting OCGA § 23-3-58, which provides that "a confidential relationship exists 'where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another'").

9

circumstantial evidence.[16] The jury should have been given an opportunity to assess the weight of this evidence as well as Thaxton's credibility regarding her assertions that Silvian independently made his choices. The jury could find that Thaxton was not a credible witness in that regard, and it was not necessary for Felts to establish through direct evidence exactly how Thaxton may have unduly influenced Silvian.[17]

In addition to Thaxton's testimony, the jury could draw conclusions about whether undue influence occurred by viewing the handwriting of the beneficiary designation form,[18] hearing about Silvian's capacity, including his physical, mental, and emotional state in the time leading up to the beneficiary change, and considering testimony from Felts, Silberman, his doctor, and his attorney related to those changes.[19] While the evidence does not demand a verdict in favor of Felts, neither did

---

[16] See id.

[17] See id. at 512-513 (1).

[18] While Felts did not state an independent claim of forgery of the beneficiary form, viewing the handwriting on the form would be pertinent to the question of undue influence as the jury may or may not accept as credible Thaxton's testimony that Silvian actually signed the form.

[19] See *Henry*, 366 Ga. App. at 640 (1) ("[A]n attack on a will as having been obtained by undue influence may be supported by a wide range of testimony, including evidence of a confidential relation between the parties, the reasonableness or unreasonableness of the disposition of the testator's estate, old age, or disease

it demand a verdict in favor of Thaxton. Accordingly, we reverse the trial court's grant of a directed verdict as to Felts's claim of undue influence.

2. To the extent that Felts argues she should have been able to pursue any claim as to Silvian's capacity separate from her undue influence claim, we affirm the grant of the directed verdict.

*Judgment affirmed in part and reversed in part. Gobeil, J., concurs. Senior Judge C. Andrew Fuller, dissents.*

---

affecting the strength of the mind."). See also *Lillard v. Owens*, 281 Ga. 619, 621 (1) (641 SE2d 511) (2007) ("In light of the testator's physical condition and medicated status, a lesser degree of influence would be required to overcome his free will."); *Cook v. Huff*, 274 Ga. 186, 187 (1) (552 SE2d 83) (2001) ("[A]ll of the circumstances including the conduct and demeanor of the parties with respect to each other, their comparative ages and mental capacity, and especially any physical and mental infirmity due to advanced age . . . , may be taken into consideration.") (citation and punctuation omitted); *Brumbelow v. Hopkins*, 197 Ga. 247, 252 (3) (29 SE2d 42) (1944) (the quantity of influence necessary to dominate one's mind may vary depending on one's age, disease, and mental faculties).

A23A0662. FELTS et al. v. THAXTON.

FULLER, Senior Judge, dissenting.

Because I agree with the trial court that a jury could find undue influence only through improper speculation, I respectfully dissent.

Undue influence sufficient to invalidate an instrument is "such influence as amounts either to deception or to force and coercion, destroying free agency." *Bohler v. Hicks*, 120 Ga. 800, 809 (6) (48 SE 306) (1904); see *McGee v. Ingram*, 264 Ga. 649, 650 (1) (448 SE2d 439) (1994) (undue influence "must amount to force or fear" that "constrain[s one] to do what is against his will, but what he is unable to refuse") (citation and punctuation omitted). And it must operate on one's mind when one executes the instrument at issue. *Slosberg v. Giller*, 341 Ga. App. 581, 582 (1) (801 SE2d 332) (2017); accord *McGee*, 264 Ga. at 650 (1). Critically, "[e]vidence that shows no more than an opportunity to influence and a substantial benefit" — as is the

case here — "falls short of showing the exercise of undue influence." *Sims v. Sims*, 265 Ga. 55, 55 (452 SE2d 761) (1995); see *McGee*, 264 Ga. at 650 (1) (evidence giving rise to a "mere suspicion" of undue influence is insufficient absent a showing that another exercised "force or duress" to substitute her will for one's own).

As highlighted by the majority, "a presumption of undue influence arises where a confidential relationship existed between testator and beneficiary, with the testator being of weak mentality and the beneficiary occupying a dominant position." *White v. Regions Bank*, 275 Ga. 38, 39 (1) (561 SE2d 806) (2002). Here, however, Felts identifies no record evidence from which a jury could conclude that Thaxton and Silvian were in a confidential relationship. Simply showing that one placed "general trust and confidence" in a third party, without more, does not authorize a jury to find a confidential relationship in which the third party "was so situated as to exercise a controlling influence" over one's will that may trigger a rebuttable presumption of undue influence. *Harper v. Harper*, 274 Ga. 542, 544 (2) (554 SE2d 454) (2001) (citing OCGA § 23-2-58).

In finding a jury issue on the existence of a confidential relationship here, the majority highlights testimony by Sam Silberman, who said that Silvian told him that Thaxton "was doing all of his check writing and all of his banking transactions or

2

responsibilities that he was not able to do." But Silberman's account of Silvian's statements about Thaxton included no details regarding the scope of either Silvian's financial endeavors or Thaxton's assistance with them and likewise did not identify the nature or extent of "check writing" and unspecified "banking transactions" that Silvian "was not able to do." Consequently, a jury would have to improperly speculate about all of those unknown facts to infer a confidential relationship from Silberman's vague testimony. See OCGA § 23-2-58; see also *Gullatt v. Fain*, 259 Ga. App. 230, 231 (576 SE2d 612) (2003) (speculation cannot defeat a motion for a directed verdict).

Felts likewise identifies no record evidence from which a jury could find — without engaging in speculation and conjecture — that Silvian was incompetent when he signed the beneficiary designation form. See *Kindred Nursing Centers Ltd. Partnership v. Chrzanowski*, 338 Ga. App. 708, 714 (1) (791 SE2d 601) (2016) ("[E]very person is presumed to have all [his] mental faculties and to be of normal and ordinary intelligence, and where it is contended that one who executed a contract was not competent to execute it, the burden is upon she who asserts the incompetency.") (citation and punctuation omitted). And more importantly, she identifies no record evidence that Thaxton at any time engaged in any form of

3

"deception or force and coercion" to substitute her will for Silvian's, regardless of whether his physical or mental state may have been compromised to some extent. *Slosberg*, 314 Ga. at 97 (2) (b); *Bohler*, 120 Ga. at 809 (6); see *Harper*, 274 Ga. at 544 (2) ("The indulgence of mere suspicion of undue influence cannot be allowed.").

For these reasons, Felts has not met her burden of showing that the trial court erred when it directed a verdict for Thaxton on Felts's undue influence claim. To the contrary, the facts in this case fall far short of the quantum of evidence Georgia appellate courts have found sufficient to give rise to a jury question on this issue. Compare *Bailey v. Edmundson*, 280 Ga. 528, 528, 529-531 (1) (630 SE2d 396) (2006) (finding a jury question as to whether certain third party caregivers unduly influenced the testator to change his will, where (i) "there was some evidence of a confidential relationship" between the testator and the caregivers, who actively encouraged and arranged for the drafting and execution of the new will and isolated the testator from his only child; and (ii) the testator suffered from terminal brain cancer, "severe physical inabilities, memory impairment, and mental confusion" and had become dependent on the caregivers), *Cook v. Huff*, 274 Ga. 186, 187-188 (1) (552 SE2d 83) (2001) (finding a jury question as to undue influence where, inter alia, the propounder of a will had tried to alienate the testator from his other family

4

members, actively encouraged him to execute the new will, and arranged a meeting with the drafting attorney), and *Skelton v. Skelton*, 251 Ga. 631, 634 (5) (308 SE2d 838) (1983) (finding a jury question as to undue influence where there was evidence that: (i) a confidential relationship existed between the testator and propounder; (ii) the elderly testator was "susceptible to delusions," thought "his son and daughter-in-law were trying to poison him," and "left three of his children nominal bequests when they were not disliked or disfavored by him during his lifetime"; (iii) "the will was made after [the propounder] had discussed its contents with the [drafting] attorney"; and (iv) the propounder "was present when the will was made," "was with the testator the majority of time and much more than" others, and kept the will a secret from others for years), with *Brumbelow v. Hopkins*, 197 Ga. 247, 252-253 (3) (29 SE2d 42) (1944) (concluding that a litany of circumstantial evidence was insufficient to submit the issue of undue influence to a jury).

I also respectfully disagree with the majority's reliance on *Bean v. Wilson*, 283 Ga. 511 (661 SE2d 518) (2008). In *Bean*, the Supreme Court of Georgia determined that it was for the jury to decide whether a confidential relationship existed between Vinson (the testator) and Lovins, his live-in nurse. 283 Ga. at 512. As a basis for its ruling, the Court explained:

As Vinson's full-time, live-in caregiver, Lovins took care of all of Vinson's personal and medical needs. Vinson, an elderly amputee, depended on Lovins to transport him, bathe him, groom him, feed him, cook for him, clean for him, arrange for his medical care, and teach him to walk. Also, the evidence reveals that Vinson informed Lovins that he was afraid that his daughter would put him in a nursing home if Lovins did not continue to take care of him. Furthermore, there is evidence that Lovins and [another beneficiary under Vinson's will] isolated Vinson from Wilson[, Vinson's daughter and sole surviving heir at law,] and her daughters by blocking calls from Wilson to her father, throwing away letters that one of Wilson's daughters attempted to send to Vinson, and refusing to allow Wilson and her daughters to see Vinson when they attempted to visit him.

Id. at 511-512. Here, there is no evidence that Thaxton took care of all of Silvian's needs, isolated him, or played on his fears of abandonment — rather, the facts here fall far short of the substantial evidence of a confidential relationship and undue influence in *Bean*.

I likewise disagree with the majority's suggestions that "the jury could draw conclusions about whether undue influence occurred by viewing the handwriting of the beneficiary designation form" and that "viewing the handwriting on the form would be pertinent to the question of undue influence." It is undisputed that Thaxton filled in all entries on the form other than the signature. And assisting with such

6

clerical tasks establishes neither a confidential relationship nor undue influence. To the extent that the majority suggests that someone other than Silvian may have signed the form, that would defeat Felts's undue influence claim, which necessarily depends on the proposition that the form reflects Silvian's decision (however unduly influenced), not that of someone pretending to be him.

On the facts of this case — even assuming that there was some evidence of opportunity and benefit — a jury could find undue influence only through speculation or conjecture, which is insufficient to defeat a motion for a directed verdict. See *Sims*, 265 Ga. at 55 ("an opportunity to influence and a substantial benefit" alone do not show undue influence); *Singleton v. Phillips*, 229 Ga. App. 286, 288 (1) (494 SE2d 66) (1997) ("[W]hen the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.") (citation and punctuation omitted); accord *Brumbelow*, 197 Ga. at 252 (3) ("That the testator was an old man, that he disinherited all of his children except the propounder, that he became unfriendly with his other children amounting to an estrangement, would be insufficient to show such influence over the mind of the testator as would invalidate the will."); see also generally *Strong v. Holden*, 287 Ga. 482, 484 (2) (697 SE2d 189) (2010) (absent evidence that

7

propounder "controlled the will, conduct, and interest of" testator, "[c]aveator's speculation about propounder's supposed influence does not give rise to a genuine issue of material fact" sufficient to defeat summary judgment).

The majority asserts that evidence correctly characterized by the trial court as speculative "is instead circumstantial evidence." Even so, the same result follows. "[B]efore a plaintiff in a civil case can have a verdict in [her] favor supported solely by circumstantial evidence, such evidence must be such as to reasonably establish the theory relied upon, and to preponderate to that theory rather than to any other reasonable hypothesis." *Handberry v. Manning Forestry Svcs.*, 353 Ga. App. 150, 156 (1) (836 SE2d 545) (2019) (citation, punctuation, and emphasis omitted). Thus, a party on whom a burden of proof rests may meet that burden with circumstantial evidence only if such evidence "tend[s] in some proximate degree to establish the conclusion[s] he claims" and "also render[s] less probable all inconsistent conclusions." *Allen Kane's Major Dodge v. Barnes*, 243 Ga. 776, 780-781 (257 SE2d 186) (1979) (citation and punctuation omitted); see *Ladson Motor Co. v. Croft*, 212 Ga. 275, 277 (92 SE2d 103) (1956) ("Facts which are consistent with either of two opposing theories prove nothing."). Here, there is no direct evidence of either a confidential relationship or undue influence, and any circumstantial evidence of either

8

is, at most, equally consistent with a finding that neither existed. I therefore would affirm the trial court's ruling that the evidence was insufficient to raise a jury issue as to undue influence.